IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

TERRENCE EDMOND TATE,                )
                                     )
              Plaintiff,             )
                                     )
         v.                          )        1:10cv616
                                     )
BILLIE MARTIN, J. KELLY, and         )
KENNETH M. JONES,                    )
                                     )
              Defendants.            )

**MEMORANDUM OPINION AND ORDER**

THOMAS D. SCHROEDER, District Judge.

     Plaintiff Terrence Edmond Tate, a prisoner in the custody
of the State of North Carolina, brought this action pursuant to
42 U.S.C. § 1983.  (Docs. 4, 9.)  He alleges that several prison
administrators, Defendants Billie Martin, Jerry Kelly, Jr.,[1] and
Kenneth Jones, denied him adequate medical care and housing in
prison by failing to diagnose and treat his pneumonia, which
resulted in hospitalization, and by exposing him to secondhand
tobacco smoke – all in violation of the Eighth Amendment.  (Doc.
4 at 3.)  Before the court is Defendants' motion for summary
judgment on all claims.  (Doc. 30.)  For the reasons set forth
below, the motion will be granted.

---

[1] The corrected complaint originally listed only "J. Kelly," (Doc. 4 at
1), but Defendants' answer clarifies that "Jerry Kelly, Jr." is that
Defendant's full name (Doc. 21 at 1).

**I.   BACKGROUND**

The facts, in the light most favorable to Tate, establish the following:

Beginning in April 2004, Tate was incarcerated at Albemarle Correctional Institution ("ACI"). (Doc. 4 at 9.) On Thursday, January 12, 2006, he declared a medical emergency, complaining of chest pain. (Doc. 9 at 2 (reporting date as January 11); Doc. 26-1 at 35.) Dr. Sami Hassan, the doctor at ACI, examined Tate. Although Tate reported chest pain, he presented with no cough, no shortness of breath, and no cardiac history. (Doc. 26-1 at 35.) An ear, nose, and throat exam was normal, his oxygen saturation was 99%, and his blood pressure was 138/92. (Id.) Tate reported he had been lifting weights a day earlier; he "[i]ncline presses 225 [pounds]." (Id.) The doctor believed Tate had pulled a muscle, so he gave him medication and instructed him not to engage in any strenuous activities or sports. (Id.; id. at 43, 46.)

Two days later, on Saturday, January 14, Tate again declared a medical emergency, saying that he was unable to breathe. (Id. at 35.) According to a medical staff member, however, he was "talking continually while in medical," presented no acute respiratory distress, and his breathing was regular and even. (Id.) His oxygen saturation was 98-99%.

(Id.)  He was given Tylenol for his discomfort and told to continue his present medications.  (Id.)

The following day, Sunday, January 15, Tate was examined by medical staff at the request of a corrections officer, who observed Tate lying on the floor of his cell.  (Id. at 34.)  The incident was not reported as a medical emergency.  (Id. ("No code 900 called."))  Tate again complained of chest pain and demanded an X-ray.  (Id.)  Medical staff examined him and determined that his lungs were clear and that he was in "no distress."  (Id.)  The nurse noted Tate's "facial grimaces" and somewhat limited range of motion; yet, his vital signs appeared normal, with blood pressure at 120/70 and oxygen saturation at 98-99%.  (Id.)  Tate was directed to continue his medications and to follow up.  (Id.)

The following day, Monday, January 16, Tate again declared a medical emergency, complaining of chest pain.  (Id.)  He was seen by the medical staff, who noted that his breathing was "deep, even, and unlabored" and that he was "yelling at staff, stating 'what do I need to do to get out of here?'"  (Id. at 33-34.)  He was examined again; his skin was warm and dry, his lips and nail beds were pink, and his blood pressure was 118/68.  (Id. at 34.)  Tate was instructed to rest and take his medications as ordered.  (Id. at 33.)

On Tuesday, January 17, Dr. Hassan returned to ACI and examined Tate again.[2] (Id. at 42.) Dr. Hassan noted that Tate complained of a cough and left-sided chest pain, but the doctor found that Tate was in no acute distress. (Id.) Dr. Hassan transferred Tate to Stanly Memorial Hospital ("SMH") for further testing. (Id. at 46.) There, Dr. Michael Hadnagy examined Tate and ordered an X-ray, which revealed "near complete opacification of the left hemi-thorax due to a combination of pulmonary consolidation and accumulating pleural fluid." (Id. at 47.) In other words, there was fluid in Tate's left lung and excess fluid in the space surrounding that lung, which made it appear nearly opaque on the X-ray. Dr. Hadnagy found that Tate was in "no acute distress." (Id. at 46.) The doctors at SMH recommended that Tate be transferred to a hospital in Charlotte, North Carolina, for "definitive care." (Id. at 58.)

Tate was admitted to the Charlotte hospital the following day.[3] (Id.) Once there, he underwent a "bronchoscopy, left

---

[2] According to Tate, a doctor had not been available from Saturday to Monday because of the holiday weekend. (Doc. 9 at 5.) The court takes judicial notice of the fact that Monday, January 16, 2006, was Martin Luther King Day, a federal holiday.

[3] Tate alleges that his admittance was delayed because one of the two corrections officers in charge of him refused to take him to Charlotte on January 17; the officer's shift was almost over and he wanted to get back to ACI before the end of his shift. (Doc. 9 at 6-7.) Tate does not provide any evidence other than this unsworn, conclusory assertion, and neither corrections officer is currently a defendant in the case.

thoracotomy and decortication of the left lung."[4]   (Id. at 54.)

In layman's terms, a surgeon, Dr. Charles Harr, cut into Tate's

chest and removed part of a lobe of his left lung.   Dr. Joseph

Lang, who consulted on Tate's case, "suspect[ed] . . .

community-acquired pneumonia" had caused the build-up of pleural

fluid.   (Id. at 52.)   Pneumonia was also the diagnosis on his

discharge papers.     (Id. at 54.)     Tate recuperated in the

hospital for about ten days and was discharged on January 30.

(Id. at 54-56.)

     Upon   his   discharge,   Tate   was   housed   at   Piedmont

Correctional Institution ("PCI").   (Id. at 50; Doc. 4 at 9.)   He

was discharged from regular medical care at PCI on February 27

(Doc. 26-1 at 48) and transferred back to ACI on March 2 (Doc.

34 at 3).   On March 27, Dr. Harr "recommend[ed] [a] smoke free

area to [decrease][5] risk of recurrent infection," released Tate

from   his   weight-lifting   restrictions,   and   recommended

pneumococcal and flu vaccines.   (Doc. 26-1 at 44.)   On March 30,

---

[4]  A bronchoscopy  is  an  "inspection  of  the  interior  of  the
tracheobronchial  tree  through  a  bronchoscope."   STEDMAN'S MEDICAL
DICTIONARY 214 (25th ed. 1990).   A thoracotomy is "an incision into the
chest wall."   Id. at 1594.   A decortication is a "removal of the
cortex, or external layer, . . . from any organ" or "an operation for
removal of the residual clot and/or newly organized scar tissue that
form after . . . neglected empyema."   Id. at 403.   Tate was diagnosed
with empyema (Doc. 26-1 at 54), which is "pus in a body cavity,"
STEDMAN'S MEDICAL DICTIONARY 505.

[5]  The notation is actually an up arrow, but "decrease" is presumably
meant.

Dr. Hassan noted that the patient "needs smoke free facility Rec. Cardiovas. & Pulm." (Doc. 31-1 at 26.) Tate asserts that those recommendations were followed and he was transferred back to PCI for approximately 16 months, until July 2007. (Doc. 35 at 2.) According to Tate, PCI was the only smoke-free facility in North Carolina at the time. (Id.) On July 10, 2007, he was transferred back to ACI. (Id.) Nine days later, Dr. Hassan again noted that Tate "needs smoke free facility per Cardiology & Pulm. recs. in past." (Doc. 31-1 at 27.)

Tate alleges that, despite the doctors' recommendations, he remained at ACI and was exposed to secondhand tobacco smoke that caused chest pain while he was recuperating from emergency lung surgery. (Doc. 34 at 9.) He states that until he left ACI in 2008 (the exact date is not indicated), he witnessed fellow inmates smoking in the dorms, medical staff smoking in front of the medical building, and other staff members smoking on the sidewalks and on the basketball court on "numerous" occasions. (Id.) Tate "had to pass through a cloud of smoke to go eat," because staff smoked "in front of Master Control" outside the dining facility. (Id.) Another inmate attested to "daily" presence of secondhand smoke at ACI during 2007 and 2008 – including on the path outside the dining facility and outside "on the edge of the basketball court which is approximately 20

feet from the weight pile" - and stated that staff members, rather than inmates, were smoking.[6] (Id. at 10.)[7]

On July 23, 2007, Defendant Martin advised Tate that smoking was not permitted indoors at ACI and was allowed outside only in designated areas. (Doc. 31-1 at 6, 30.) She also told him that it was his responsibility to report smoking violations to staff if he believed the rules were being violated. (Id. at 6, 30.) She told him it was not the responsibility of the medical staff to move him to avoid exposure to secondhand tobacco smoke. (Id. at 30.) According to Tate, on August 17, 2008, a nurse informed him that Martin stopped his transfer to a smoke-free facility.[8] (Doc. 34 at 4.)

On August 22, 2007, Tate filed a grievance, complaining about his exposure to secondhand tobacco smoke and requesting a transfer to a smoke-free facility. (Id.; Doc. 31-2 at 6.) Defendant Kelly, who was the unit manager at the time, reviewed

---

[6] Defendants dispute these facts, asserting that ACI was entirely smoke-free indoors as of 2006 and that smoking was limited to designated, outdoor areas, which Tate could avoid. (Doc. 31-1 at 6-7; Doc. 31-4 at 4.) Defendants assert that ACI became entirely smoke-free in 2009. (Doc. 31-2 at 3, 23-26.)

[7] There are three additional affidavits from inmates, but one does not relate to the relevant time period (Doc. 34 at 11 (describing conditions at ACI until 2006)), and the other two are not notarized or sworn (id. at 12, 13).

[8] Martin disputes this assertion and denies having authority to determine where an inmate is housed. (Doc. 31-1 at 7; Doc. 31-4 at 3-4.) Tate does not identify the nurse who allegedly informed him.

the grievance on August 30 and repeated Martin's statement: ACI only allows smoking in designated outdoor areas, and Tate should report any violations to management. (Doc. 31-2 at 6.) Defendant Jones, who is a grievance examiner with the Inmate Grievance Resolution Board ("IGRB"), reviewed the file on October 31, approved of the actions taken, and considered the grievance resolved. (Id. at 5; Doc. 31-3 at 1-2).

Tate remained at ACI until sometime in mid-2008. The record is not clear on exactly when he left, but medical notes show he was still at ACI on March 5, 2008 (Doc. 31-1 at 30), and a health screening shows he had left ACI and was at Mountain View Correctional Institution by July 8, 2008 (Doc. 31-4 at 14). During Tate's stay at ACI (which was 9 to 12 months) he never filed any other grievance related to secondhand smoke. The only other grievance he filed related to obtaining winter clothing. (Doc. 9 at 15-17.) There is no record of Tate being refused any requested medical consult or treatment relating to his lungs or secondhand tobacco smoke.

In his subsequent visits to the medical clinic while he was at ACI, Tate never related any symptom to, or even mentioned, secondhand smoke. On August 31, 2007, Tate collapsed or "dropped out" while mowing the lawn. (Doc. 31-1 at 30.) He

alleges that a prison officer[9] forced him to cut grass, even though his medical restrictions prevented him from performing that kind of work and he did not have proper boots. (Doc. 9 at 8.) The medical staff examined him and sent him back to housing to rest. (Doc. 31-1 at 30.) Tate claims he did not file a grievance against the officer because he feared retaliation. (Doc. 9 at 9.) Then, on March 5, 2008, the medical staff examined him for a pulled hamstring. (Doc. 31-1 at 30.) There is no record of any other medical visit or grievance from July 2007 to July 2008.[10]

Tate filed his initial *pro se* complaint on August 2, 2010, which was then struck for failure to use the correct § 1983 forms. (Docs. 2, 3.) He filed a corrected complaint on September 15, 2010, and an amended complaint on November 1, 2010. (Docs. 4, 9.) He is suing all three Defendants in their individual and official capacities. Documentation of several of his grievances is included in the complaints. Defendants answered, asserting several defenses, including sovereign immunity and the statute of limitations. (Doc. 21.) After Tate

---

[9] This officer was originally named as a Defendant in this case but was dismissed on September 17, 2010.

[10] There is no record evidence that Tate was at ACI at any time after 2008. Although Defendants submitted documentation regarding later medical visits and grievances at Mountain View and Columbus Correctional Institutions (Doc. 31-4 at 3-6, 28-29, 31-36, 40), that evidence is not relevant to Defendants' actions or liability.

voiced difficulty obtaining his medical records from ACI (Doc. 23), Defendants submitted those records to the court (Doc. 26-1).

Defendants have now moved for summary judgment on all issues before the court. (Doc. 30.) They have submitted four supporting affidavits with accompanying exhibits: those of Defendant Martin (Doc. 31-1); Defendant Kelly (Doc. 31-2); Finesse Couch, the Executive Director of the North Carolina IGRB (Doc. 31-3); and Stephanie Leach, the Risk Manager/Standards Director of the North Carolina Division of Adult Corrections (Doc. 31-4). Tate opposes the motion (Doc. 35) and has submitted several affidavits from himself, his mother, and fellow inmates at ACI (Doc. 34). The motion is now ripe for consideration.

## II. ANALYSIS

### A. Standard of review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that no genuine dispute of material fact remains. When the non-moving party has the burden of proof, the moving party is entitled to summary judgment if it shows the absence of material disputed facts. Celotex Corp. v. Catrett, 477 U.S.

317, 322-23, 325 (1986).  In assessing whether a genuine dispute of material fact sufficient to preclude summary judgment exists, the court regards the non-movant's statements as true and accepts all admissible evidence and draws all inferences in the non-movant's favor.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986).  But a non-moving party must establish more than the "mere existence of a scintilla of evidence" to support his position.  <u>Id.</u> at 252.  If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted."  <u>Id.</u> at 249-50.  Ultimately, summary judgment is appropriate where the non-movant fails to offer "evidence on which the jury could reasonably find for the plaintiff."  <u>Id.</u> at 252.  The court construes Tate's *pro se* pleadings and motions liberally.  <u>Haines v. Kerner</u>, 404 U.S. 519, 520-21 (1972).

### B.  Official capacity claims – sovereign immunity

Defendants assert that they are immune from suit in their official capacities under the Eleventh Amendment.  (Doc. 21 at 10.)  Tate does not directly address this argument, but as Tate is *pro se* and opposes summary judgment generally, the court will consider the merits of this defense.  <u>See</u> <u>Stevenson v. City of Seat Pleasant</u>, __ F.3d __, No. 12-2047, 2014 WL 660919, at *4 n.3 (4th Cir. Feb. 21, 2014).

The Eleventh Amendment bars suits against states and any state instrumentality properly characterized as an "arm of the

state." <u>Regents of the Univ. of Cal. v. Doe</u>, 519 U.S. 425, 429-30 (1997). Eleventh Amendment immunity is not absolute, however. To ensure the enforcement of federal law, "the Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law." <u>Frew ex rel. Frew v. Hawkins</u>, 540 U.S. 431, 437 (2004) (citing <u>Ex parte Young</u>, 209 U.S. 123 (1908)). Federal courts thus may order prospective relief but cannot order retrospective relief, such as damages, unless the state waives its immunity or Congress abrogates the state's immunity in exercising its powers under the Fourteenth Amendment. <u>Id.</u>; <u>Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.</u>, 527 U.S. 666, 670 (1999).

Here, Defendants are properly characterized as state officials when sued in their official capacities. <u>Hafer v. Melo</u>, 502 U.S. 21, 25 (1991). Tate seeks a declaratory judgment and damages against them. (Doc. 4 at 14-16.) Because Defendants have not waived their immunity and Congress has not abrogated it for § 1983 actions, Tate cannot seek damages against them in their official capacities. <u>See Kelly v. Maryland</u>, 267 Fed. App'x 209, 210 (4th Cir. 2008) (citing <u>Will v. Mich. Dep't of State Police</u>, 491 U.S. 58, 71 (1989)) ("It is now well settled that a state [or state official] cannot be sued

under § 1983.")[11]  Tate's request for prospective relief – either in the form of a declaratory judgment or an injunction – fails because he does not allege an "ongoing violation of federal law" permitting the application of the Ex parte Young doctrine.  See DeBauche v. Trani, 191 F.3d 499, 504-05 (4th Cir. 1999) (holding that Eleventh Amendment immunity barred declaratory and injunctive relief when no ongoing violation of federal law was alleged).  Indeed, it is unclear what use injunctive relief would be to Tate, as his current address indicates he is no longer housed at ACI and there is no allegation or evidence that he is likely to be returned there.  (See Doc. 35 at 7-8.)  In any event, Tate does not challenge that all North Carolina prison facilities are now smoke-free.

Because Tate seeks damages and prospective relief against state officials in their official capacities, but does not allege an ongoing violation of federal law, those claims are barred by Eleventh Amendment immunity.

### C.  Individual capacity claims – qualified immunity

Tate also asserts claims against Defendants in their individual capacities; he alleges that Defendants have been deliberately indifferent to his serious medical needs and thus

---

[11] Unpublished decisions of the Fourth Circuit are not precedential but are cited for their persuasive authority.  See Collins v. Pond Creek Mining Co., 468 F.3d 213, 219 (4th Cir. 2006).

have violated his Eighth Amendment rights.  Defendants contend that they have not violated Tate's constitutional rights, but even if they have, qualified immunity shields them from liability.  (Doc. 31 at 13-17, 18-20.)[12]

The doctrine of qualified immunity "balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  Pearson v. Callahan, 555 U.S. 223, 231 (2009).  The burden of proof and persuasion rests on the official asserting qualified immunity.  Meyers v. Balt. Cnty., Md., 713 F.3d 723, 731 (4th Cir. 2013).

Qualified immunity protects officials from personal liability "unless a plaintiff [shows] (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged

_____

[12] Defendants also asserted the statute of limitations as an affirmative defense in their answer.  (Doc. 21 at 9.)  A three-year statute of limitations would bar Tate's claims that accrued prior to August 2, 2007, which includes the diagnosis and treatment of his pneumonia in January 2006.  See Nat'l Adver. Co. v. City of Raleigh, 947 F.2d 1158, 1161-62 (4th Cir. 1991) (personal injury § 1983 actions have three-year statute of limitations, borrowed from N.C. Gen. Stat. § 1-52(5)).  Although Tate attempts to avoid this result by claiming that he continues to suffer from the events of January 2006 and is forever disfigured by his scar (Doc. 34 at 6), "continuing ill effects of an original violation . . . do not constitute a continuing violation."  A Soc'y Without A Name v. Virginia, 655 F.3d 342, 348 (4th Cir. 2011).  Insofar as Defendants did not raise that defense in their motion for summary judgment (Docs. 30, 31), the court has not considered it for the present motion.

conduct." <u>Ashcroft v. al-Kidd</u>, 131 S. Ct. 2074, 2080 (2011).
Courts have discretion as to which prong to analyze first, as
failure to satisfy either prong ends the inquiry in favor of
immunity for the official. <u>Pearson</u>, 555 U.S. at 236.

**1.   Violation of a constitutional right**

The first question in the qualified immunity inquiry asks
whether the defendant-official violated a constitutional right
of the plaintiff. "The Constitution does not mandate
comfortable prisons," but at a minimum, prison officials "must
provide humane conditions of confinement," including "adequate
food, clothing, shelter, and medical care." <u>Farmer v. Brennan</u>,
511 U.S. 825, 832 (1994) (internal quotation marks omitted)
(quoting <u>Rhodes v. Chapman</u>, 452 U.S. 337, 349 (1981)).
"[D]eliberate indifference to [a prisoner's] serious medical
needs" violates the Eighth Amendment. <u>Estelle v. Gamble</u>, 429
U.S. 97, 104 (1976).  To succeed on his Eighth Amendment claim,
Tate must show both that his medical needs were sufficiently
serious – an objective standard – and that Defendants were
deliberately indifferent to those needs – a subjective standard.
<u>Farmer</u>, 511 U.S. at 834, 837–38.

Tate's claims break down into two discrete medical
problems: the failure to timely diagnose and respond to his
pneumonia in January 2006; and his exposure to secondhand

tobacco smoke at ACI from July 2007 until he was transferred away in mid-2008.  Each will be addressed separately below.

### a.    Sufficiently serious medical need

"As a general proposition, a medical need may be deemed objectively serious if it is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"  Webb v. Hamidullah, 281 F. App'x 159, 165 (4th Cir. 2008) (quoting Ramos v. Lamm, 639 F.2d 559, 575 (10th Cir. 1980)).  Pneumonia that resulted in emergency surgery and hospitalization meets this standard.

Exposure to secondhand tobacco smoke (sometimes called "environmental tobacco smoke" or "ETS") has frequently been recognized under the Estelle framework as a serious medical injury or need, even when medical problems are not yet evident. See Helling v. McKinney, 509 U.S. 25, 33-34 (1993) (finding deliberate indifference to a serious medical need when prison officials allowed a prisoner to be exposed to his cellmate's five-pack-a-day smoking habit).  Even when the exposure is not as severe as in Helling, courts have found a serious medical need when the prisoner has a history of respiratory problems. See, e.g., Tudor v. Harrison, 195 F. App'x 160, 161 (4th Cir. 2006) (affirming district court's limited finding of deliberate indifference to serious medical need when prison failed to

enforce non-smoking policy or to develop a screening process to separate smokers from non-smokers with medical needs, such as asthma); <u>Alvarado v. Litscher</u>, 267 F.3d 648, 651 (7th Cir. 2001) (affirming district court's denial of motion to dismiss when prisoner with severe chronic asthma was exposed to secondhand tobacco smoke because guards failed to enforce non-smoking policy); <u>Reilly v. Grayson</u>, 310 F.3d 519, 521 (6th Cir. 2002) (affirming district court's finding of deliberate indifference to serious medical need when prison failed to house asthmatic prisoner in a non-smoking unit, despite medical recommendations, which resulted in prisoner's exposure to secondhand tobacco smoke).[13]

Tate had undergone emergency lung surgery only eighteen months before he transferred back to ACI and complained about secondhand tobacco smoke in July and August 2007. A prison doctor had recommended as recently as July 19, 2007, that Tate be placed in a smoke-free facility. (Doc. 31-1 at 27.) For the purposes of the present motion, the court assumes that Tate's history of respiratory problems and the recommendations for a smoke-free facility establish that his medical condition, which

---

[13] Pre-<u>Helling</u> decisions did not always recognize exposure to secondhand tobacco smoke as a serious medical need. <u>See, e.g.</u>, <u>Clemmons v. Bohannon</u>, 956 F.2d 1523, 1526-28 (10th Cir. 1992) (en banc).

17

would be aggravated by secondhand smoke, was sufficiently serious.

### b. Deliberate indifference

"Deliberate indifference is a very high standard – a showing of mere negligence will not meet it." Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999). A prison official is deliberately indifferent if he "knows of and disregards an excessive risk to inmate health or safety." Farmer, 511 U.S. at 837. It is a subjective standard; the official must know the facts from which an inference of serious harm could be drawn and must actually draw the inference. Brown v. Harris, 240 F.3d 383, 389 (4th Cir. 2001) (citing Farmer, 511 U.S. at 837).

The Fourth Circuit has explained that liability under the deliberate indifference standard requires two showings:

> First, the evidence must show that the official in question subjectively recognized a substantial risk of harm. It is not enough that the officers *should have* recognized it; they actually must have perceived the risk. Second, the evidence must show that the official in question subjectively recognized that his actions were inappropriate in light of that risk. As with the subjective awareness element, it is not enough that the official *should have* recognized that his actions were inappropriate; the official actually *must have* recognized that his actions were insufficient.

Parrish ex rel. Lee v. Cleveland, 372 F.3d 294, 303 (4th Cir. 2004) (emphasis in original) (citations and internal quotation marks omitted). Of course, even without direct evidence, a

reasonable fact-finder "may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Farmer, 511 U.S. at 842.

When it comes to a prisoner's medical care, mere negligence or malpractice does not constitute deliberate indifference. See Johnson v. Quinones, 145 F.3d 164, 166 (4th Cir. 1998) (finding no deliberate indifference when doctors negligently failed to diagnose pituitary tumor, resulting in prisoner's lost eyesight, because prisoner did not prove that doctors subjectively knew or inferred that prisoner's symptoms indicated a tumor); Miltier v. Beorn, 896 F.2d 848, 852 (4th Cir. 1990), overruled in part on other grounds by Farmer, 511 U.S. at 837. "Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985) (inadequate medical treatment of prisoner who was injured in a fall from a ladder, even if malpractice, does not constitute deliberate indifference). "[N]egligent diagnoses or treatment, without more, do not constitute deliberate indifference." Webb, 281 F. App'x at 166 (concluding that even if doctor misdiagnosed prisoner's need for hernia surgery, the fact that he did not disregard any risk of harm he subjectively knew about meant prisoner failed to show deliberate indifference).

Here, Tate has failed to establish that, as to the events of January 2006, the conduct of any Defendant fell below the standard of care, much less that it constituted deliberate indifference. Kelly and Jones were not present at ACI during the January 2006 conduct and there is no evidence they were otherwise involved in or aware of it. (Doc. 31-2 at 2; Doc. 31-3 at 1-2.) Tate does not allege that Martin was directly involved in any treatment (rather, the unchallenged evidence reveals that Nurse Hinson saw Tate on January 14 and 15, and Nurse Blackwelder saw him on January 16). (Doc. 26-1 at 33-35.) Martin is a "Nurse Supervisor II," which includes responsibility for coordinating and directing all health services within ACI. (Doc. 31-1 at 1.) Thus, she would have potential liability as a supervisory employee. However, to succeed on that claim, Tate would have to "show actual or constructive knowledge of a risk of constitutional injury, deliberate indifference to that risk, and an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." Carter v. Morris, 164 F.3d 215, 221 (4th Cir. 1999) (quoting Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994)) (internal quotation marks omitted). Moreover, "the conduct engaged in by the supervisor's subordinates must be 'pervasive,' meaning that the 'conduct is widespread, or at least has been used on several different occasions.'" Randall v. Prince

George's Cnty., Md., 302 F.3d 188, 206 (4th Cir. 2002) (quoting Shaw, 13 F.3d at 799).

Dr. Hassan first examined Tate a day after he had been lifting weights and believed that the reported chest pain was musculoskeletal and caused by a muscle strain of some kind. (Doc. 26-1 at 35, 43, 46.) All of Tate's vital signs and symptoms appeared normal; he did not even have a cough. (Id. at 35.) Dr. Hassan prescribed medication and a conservative approach. After that, ACI medical personnel examined Tate each time he asked for medical attention. Again, other than the chest pain, which was thought to be caused by a strained muscle, Tate appeared normal and healthy, and his lungs were clear. His behavior and presentation were inconsistent with his reported symptoms; although he told medical staff he could not breathe, Tate was talking "continually" and "yelling at staff," and he was not in any acute respiratory distress. (Id. at 33-35.) The nurses also dispensed medication. (Id.) Once Dr. Hassan returned after the weekend, he saw Tate and ordered an X-ray. In the end, any delay in the diagnosis of Tate's lung condition and the resulting hospitalization are unfortunate, but the evidence does not meet the threshold of demonstrating deliberate indifference by anyone else at ACI, including any supervisory liability by Martin.

Tate has also failed to establish that Defendants were deliberately indifferent to any health effect from exposure to secondhand tobacco smoke at ACI during the relevant time period - from July 2007 to mid-2008. Defendants have established that ACI was designated an indoor smoke-free facility during this time, as required by state law and, as a policy matter, restricted smoking to designated areas outdoors. (Doc. 31-4 at 4 (law requiring prisons to be smoke-free indoors passed in 2005, became effective on January 1, 2006).)

Tate contends that, as a practical matter, ACI was not smoke-free and he could not avoid being exposed to secondhand smoke. To be sure, Defendants do not contend that ACI was smoke-free outdoors, nor is that the issue. The question is whether Tate was exposed involuntarily to dangerous levels of secondhand tobacco smoke and, if so, whether Defendants were deliberately indifferent to his exposure and health.

Tate's own affidavit fails to establish how often smoking occurred in each place he reports, whether any of the outdoor smoking violated the ACI smoking policy, or whether any Defendant knew of any smoking occurring at ACI. His affidavit states, in its entirety:

> From 2004 to 2008 I was housed at Albemarle
> Correctional Institution (ACI), (ecept [sic] the times
> I was in the hospital/Piedmont Correctional
> Institution (PCI) Infirmary) . . . where I was
> involuntarly [sic] exposed to environmental tobacco

22

> smoke (ETS)/secondhand smoke, which caused chest and
> back pain (a lot of discomfort) while recouperating
> [sic] from emergency lung surgery.  I witnessed [sic]
> inmates smoking in the dorms (by bunks & bathrooms) .
> . .  medical staff smoking in front of the medical
> building . . .  custody (C.O's, SGT's, Lt.'s, unit
> managers, secretaries, case managers) smoking on the
> sidewalk in front of Master Control, and on the
> basketball court on Tillery unit.  I witnessed these
> things happen on numerous ocassions [sic] especially
> in front of Master Control, because on the way to the
> kitchen I had to pass through a cloud of smoke to go
> eat.

(Doc. 34 at 9 (no alterations).)  Tate bears the burden of

producing sufficient evidence for a reasonable fact-finder to

conclude that his constitutional rights have been violated.

But, except for his claim about unspecified smoking in the

dorms, his testimony describes outdoor smoking that is

consistent with ACI's smoking policy.  As to the outdoor

smoking, moreover, Tate claims *involuntary* exposure only to

smoking he encountered on the way to the kitchen.  Inmate

Kenneth Spellman is more specific as how often smoking occurred,

stating that he saw smoking "on a daily basis," sometimes "two

or three times a day," (id. at 10), but he does not provide

evidence as to whether any of the outdoor smoking violated the

ACI smoking policy, whether it could not be avoided by Tate, or

whether any Defendant knew of any smoking occurring at ACI.[14]

---

[14] Spellman's evidence also contradicts Tate's.  While Tate reports
inmates smoking inside the prison, inmate Spellman's affidavit, which
Tate offers, specifically states that "the exposure [to secondhand
smoke] was not from fellow inmates." (Id. at 10.)  For purposes of

Viewing the evidence in the light most favorable to Tate, the court accepts that it is sufficient to establish that Tate encountered some exposure. That said, Tate has produced no evidence that Martin, Kelly, or Jones *knew* that smoking was occurring outside of designated areas or that Tate was unable to avoid exposure to secondhand tobacco smoke. In addition, Kelly never spoke to Tate personally, and Tate never reported to him that inmates were smoking in violation of the policy. (Doc. 31-2 at 2.) To constitute deliberate indifference, "[i]t is not enough that the officers *should have* recognized [the risk]; they actually must have perceived the risk." <u>Parrish</u>, 372 F.3d at 303 (emphasis in original). Martin states that ACI's smoking policy allowed Tate to avoid exposure to secondhand smoke, and Tate does not contest that he was instructed to report any smoking violation to staff. (Doc. 31-1 at 6-7.) Yet, after Tate's initial complaint in July/August 2007, there is no evidence that he ever complained to ACI medical staff about tobacco smoke or sought an appointment with medical staff regarding respiratory problems. He did visit the medical clinic for other problems, including a pulled hamstring (<u>id.</u> at 30), but he never complained about chest pain, trouble breathing, or any other symptom possibly related to secondhand tobacco smoke

the pending motion, the court views all evidence in the light most favorable to Tate.

exposure. He also never filed another grievance related to secondhand smoke. So, even assuming that Tate has adduced sufficient evidence that *he* was exposed involuntarily to secondhand smoke (which is questionable), his lack of evidence of any other report of respiratory difficulty from August 2007 to mid-2008, combined with the prison's grievance procedure to address any violations of the smoke-free policy, defeats Tate's claim that any Defendant was deliberately indifferent to any serious medical need caused by exposure to secondhand tobacco smoke.

### 2. Violation of a "clearly established" right

Because the court finds that Tate has not established a violation of his constitutional rights, there is no need to reach the question of whether those rights were clearly established. Pearson, 555 U.S. at 236.

### D. Claims based on acts by non-Defendants

In his complaint, Tate alleges wrongdoing by several people who are not named as Defendants in this suit, including being delayed getting to the Charlotte hospital (Doc. 9 at 6-7) and being forced to cut grass (id. at 8-9). Because none of these incidents involves any alleged wrongdoing by Martin, Kelly, or Jones, any claims related to those incidents are dismissed.

**III. CONCLUSION**

For the reasons stated, the court finds that sovereign immunity bars Tate's claims against Defendants in their official capacities. The court also finds that there is insufficient evidence from which a fact-finder could reasonably conclude that Tate's constitutional rights were violated, which entitles Defendants to summary judgment as to Tate's claims against them in their individual capacities.

IT IS THEREFORE ORDERED that Defendants' motion for summary judgment (Doc. 30) is GRANTED and that this action is DISMISSED WITH PREJUDICE.

____/s/____ Thomas D. Schroeder
United States District Judge

March 20, 2014